**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **CAJUN STEAMER VENTURES, LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Case No. 2:18-CV-01559-KOB** |
| | ) |
| **JEFFREY SCOTT THOMPSON,** | ) |
| | ) |
| **Defendant.** | ) |

**<u>MEMORANDUM OPINION</u>**

This matter comes before the court on Defendant Jeffrey Scott Thompson's "Motion to Dismiss Second Amended Complaint." (Doc. 19). Plaintiff Cajun Steamer Ventures, LLC ("CS Ventures") filed this suit containing 14 counts against Mr. Thompson, a former CS Ventures employee, for incidents occurring after Mr. Thompson signed a Severance Agreement and Release of Claims ("Release") and Restrictive Covenant Agreement ("RCA") with CS Ventures. CS Ventures alleges that Mr. Thompson violated various provisions of both contracts; that, in the event the court finds that the RCA was void, the Release was also void; and that Mr. Thompson committed various torts, including defamation, intentional interference with a contract, conversion, and fraud.

Mr. Thompson moves to dismiss CS Ventures' Second Amended Complaint for two reasons: (1) the complaint is a shotgun pleading in violation of Federal Rules of Civil Procedure 8(a)(2) and 10(b), and (2) the complaint fails to state a claim upon which relief can be granted in violation of Rule 12(b)(6). The parties have fully briefed the motion, and the motion is now ripe for review. For the reasons discussed below, the court will GRANT IN PART and DENY IN PART Mr. Thompson's motion to dismiss. (Doc. 19).

## I. Background

Cajun Steamer Bar & Grille ("Cajun Steamer") is a restaurant owned by CS Ventures with locations in Hoover, Trussville, and Huntsville, Alabama, and Franklin, Tennessee. When Cajun Steamer's first location opened in 2004, Mr. Thompson was employed by CS Ventures and in charge of restaurant operations for Cajun Steamer.

In 2014 or 2015, CS Ventures built the Cajun Steamer Huntsville location. It hired Anything Audio & Video, LLC to install audio and visual equipment, which cost "tens of thousands of dollars." (Doc. 14 at 14). Mr. Thompson allegedly used supplies from this project and invoiced CS Ventures supposedly for audio and video equipment from Anything Audio & Video, but was actually for work performed on his house. In the process, Mr. Thompson "specifically made false representations and also suppressed information which was material to this action." (*Id.* at 15). During this time, Mr. Thompson also allegedly "diverted equipment bought by [CS Ventures] and used the equipment expressly for installation at [his] house." (*Id.* at 14). Mr. Thompson also suppressed this information.

On February 2, 2016, Mr. Thompson and CS Ventures executed the Release and RCA. The Release "set[] forth the respective rights and obligations of [Mr. Thompson and CS Ventures] in connection with the termination of the employment of [Mr. Thompson]." (Doc. 14 at 2). According to the Release, Mr. Thompson's termination was effective as of February 1, 2016. CS Ventures paid Mr. Thompson $1.19 million to execute the two agreements— approximately 10 times his salary.

The RCA prohibited Mr. Thompson from acting in conflict with the "Business," defined as CS Ventures' "operation of five (5) Cajun Steamer Bar and Grill restaurants in Alabama, Tennessee, and Texas, serving Louisiana style cuisine, including without limitation, seafood,

wings, soups, salads and chicken." (Doc. 14-2 at 2). Specifically, Mr. Thompson could not (1) "engage in the Business within a fifty (50) mile radius of any of the current locations of the Cajun Steamer restaurants operated by the Company in Alabama, Tennessee and Texas"; (2) "recruit, solicit or otherwise contact customers or prospective customers of the Company for the purpose of engaging in the Business"; (3) "recruit, solicit or induce any person or entity, who was an employee, agent, independent contractor or representative of the Company . . . to cease their employment, engagement or other relationship with the Company or solicit the services of such person"; or (4) disclose certain confidential and trade secret information related to the Business. (*Id.* at 2–3).

The RCA allowed CS Ventures to sue Mr. Thompson, including for temporary and permanent injunctions, if Mr. Thompson breached or threatened to breach the RCA.

In the Release, Mr. Thompson agreed to "not willfully perform any acts (such as defamatory comments or threats of violence or vengeful acts) which are detrimental to the name, business or reputation of Company or Releasees." (Doc. 14-1 at 3). He also agreed to indemnify CS Ventures for the cost and/or damages caused by "the beach of any covenant, agreement or obligation." (*Id.* at 5).

In conjunction with the execution of the agreements with Mr. Thompson, X4 Investment Partners, LLC—the current parent company of CS Ventures—executed a Membership Interest Purchase Agreement with James T. Powers on February 9, 2016. Through this agreement, X4 Investments acquired Mr. Powers's 50% membership interest in Solstice Investments, LLC in exchange for $1,189,859.92. Pursuant to Section 6.3 of the Purchase Agreement, Mr. Thompson's execution and delivery of the Release was a condition precedent to X4's obligation to close the Purchase Agreement transaction with Mr. Powers.

Following signing the Release and RCA, Mr. Thompson allegedly began contacting employees to "discourage them from working for Cajun Steamer." (Doc. 14 at 4).

In late June or early July 2018, Mr. Thompson visited the Hoover location of Cajun Steamer, and made allegedly defamatory remarks to Cajun Steamer employees "and others." (Doc. 14 at 5). Specifically, Mr. Thompson told a manager that Chandler Buie, who owns all outstanding membership interests in X4, "did not understand the business, . . . was not qualified to run the business, and [Mr. Thompson] questioned his commitment to the Cajun Steamer restaurants." (*Id.*).

On July 13, 2018, Mr. Thompson "contacted numerous employees and customers to make an unknown announcement." (Doc. 14 at 5). At the Trussville location of Cajun Steamer, Mr. Thompson announced he would be opening a Cajun restaurant on Highway 150 in Hoover, Alabama. This location would be within 50 miles of the Hoover and Trussville locations of Cajun Steamer.

Mr. Thompson "then stole alcohol from the bar and drank until 3 a.m.," although he did pay for alcohol early in the evening. (Doc. 14 at 5). "At some point during the evening[,] he disrobed in the presence of Cajun Steamer employees." (*Id.*).

Mr. Thompson later solicited the General Manager and Kitchen Manager[1] of the Trussville location to leave his or their position as Cajun Steamer and work for Mr. Thompson's new restaurant.

Mr. Thompson has also at unknown times "stated to numerous individuals that he is buying back Cajun Steamer." (Doc. 14 at 6). Prospective purchasers of Cajun Steamer have approached CS Ventures, and CS Ventures claims that Mr. Thompson's statements "were made

---

[1] Based on the parties' briefs and the complaint, the court cannot determine if the Kitchen Manager and General Manager is one person or two separate people.

to intentionally interfere with these proposed sales and potentially to financially harm Plaintiff." (*Id.*).

CS Ventures filed this suit alleging 14 causes of action against Mr. Thompson. CS Ventures alleges four breaches of contract: (1) breach of the RCA's non-compete clause; (2) breach of the RCA's non-solicit clause; (3) breach of the RCA's confidentiality clause; and (4) breach of the Release. It alleges three arguments in support of rescission of the Release, in the event that the court finds the RCA void: (1) inadequate consideration; (2) fraudulent inducement; and (3) mutual mistake of fact. It alleges five torts: (1) defamation; (2) intentional interference with contract; (3) conversion of alcohol and food; (4) conversion of electronic equipment; and (5) fraud and/or suppression. CS Ventures raises two final claims: (1) unjust enrichment; and (2) a request for preliminary and permanent injunctions to enforce the non-compete, non-solicit, and confidentiality provisions of the RCA.

## II. Standard of Review

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint. Generally, the Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)). A plaintiff must provide the grounds of his entitlement, but Rule 8 generally does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley*, 355 U.S. at 47). It does, however, "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards nor do pleadings suffice that are based merely

upon "labels or conclusions" or "naked assertions" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557.

The Supreme Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting and explaining its decision in *Twombly*, 550 U.S. at 570). To be plausible on its face, the claim must contain enough facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Supreme Court has identified "two working principles" for the district court to use in applying the facial plausibility standard. The first principle is that, in evaluating motions to dismiss, the court must assume the veracity of well-pleaded factual allegations; however, the court does not have to accept as true legal conclusions even when "couched as [] factual allegation[s]" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The second principle is that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, under prong one, the court determines the factual allegations that are well-pleaded and assumes their veracity, and then proceeds, under prong two, to determine the claim's plausibility given the well-pleaded facts. That task is "context-specific" and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than

the mere possibility of misconduct." *Id.* If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claim must be dismissed. *Id.*

A "shotgun" style complaint exists when "each count . . . adopts the allegations of all preceding counts. Consequently, allegations of fact that may be material to a determination of count one, but not count four, are nonetheless made a part of count four. . . . [I]t is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Paylor v. Hartford Fire Ins.*, 748 F.3d 1117, 1126 (11th Cir. 2014) (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).

The purpose of Rule 8 is to provide a defendant notice of the claim and the facts supporting it. *Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 610 (11th Cir. 2008) ("The point [of Rule 8] is to give the defendant fair notice of what the claim is and the grounds upon which it rests."). Rule 10 works in conjunction with Rule 8 by requiring each claim "founded on a separate transaction or occurrence to be stated in separate counts if needed for clarity." *Id.* "These rules work together so that [the plaintiff's] adversary can discern what he is claiming and frame a responsive pleading." *Id.*

### III. Discussion

Mr. Thompson raises two main arguments why the court should dismiss this case. First, he contends that the entire complaint is a shotgun pleading in violation of Rules 8 and 10. Second, he contends that 10 of the 14 counts should be dismissed for failure to state a claim pursuant to Rule 12(b)(6). Specifically, he argues that (1) the non-compete clause fails to comply with Alabama law; (2) the non-solicit clause fails to comply with Alabama law; (3) adequate consideration was given for the RCA and Release, so the Release should not be set aside; (4) the complaint contains no allegation of fraudulent inducement; (5) the complaint contains no

allegation of mutual mistake; (6) the complaint contains no allegation of breach of the confidentiality agreement; (7) Mr. Thompson did not breach the Release because he did not defame CS Ventures, only allegedly Mr. Buie; (8) CS Ventures cannot recover for an allegedly defamatory statement made against Mr. Buie; (9) the complaint fails to allege facts regarding intentional interference with contract; and (10) CS Ventures would have an adequate remedy at law, so unjust enrichment is inappropriate. The court will address each argument in turn.

### a. Shotgun pleading

Mr. Thompson argues that CS Ventures' Second Amended Complaint is merely a shotgun pleading. Specifically, Mr. Thompson points to the statement "Plaintiff incorporates all previous paragraphs as if fully stated herein" before each count in the complaint." He contends that this statement prevents him from being able to discern which factual allegations apply to each count, and so he cannot formulate an answer to the complaint. Additionally, he contends that CS Ventures failed to set out each claim for relief in a separate count and failed to allege "the who, what, when, where, and how for **each element**, except scienter, of each claim for relief." (Doc. 19 at 10 (quoting *United States ex rel. Creighton v. Beauty Basics Inc.*, No. 2:13-CV-1989-VEH, 2016 WL 3519365, at *3 (N.D. Ala. June 28, 2016))).

The court acknowledges Mr. Thompson's frustration with CS Ventures' complaint. CS Ventures included the bare minimum facts, alleged nearly as many counts as pages in the complaint, and incorporated by reference *all* paragraphs—regardless of relevance—in *all* counts alleged. But while the complaint is by no means a model pleading, it does not sink to the level of being a shotgun pleading.

Rule 8 states that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The courts have defined

what "short and plain" means, and what is too short and too plain. "Shotgun pleadings are those that incorporate every antecedent allegation by reference into each subsequent claim for relief or affirmative defense." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006). Such a pleading "wreak[s] havoc on the judicial system" by "divert[ing] already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently." *Id.* (quoting *Byrne v. Nezhat*, 261 F.3d 1075, 1130 (11th Cir. 2001)).

As the first sentence in each of the 14 claims, CS Ventures notes "Plaintiff incorporates all previous paragraphs as if fully stated herein." (Doc. 14 at 6–8, 10–16). CS Ventures failed to tailor the incorporation by reference to the specific facts alleged in support of the count, and even incorporated each count into future counts. But each count does include a few general facts in support of the allegation.

For example, in Count Ten for conversion of food and alcohol, the complaint incorporates by reference all facts, and then adds three sentences that (1) "Defendant wrongfully took possession of [Plaintiff's] food and alcohol," (2) "Defendant did not pay for the food and alcohol," and (3) "Plaintiff was injured by Defendant's actions." (*Id.* at 13). While not the most robust description, Mr. Thompson is on notice of what facts CS Ventures alleges in support of Count Ten even though the complaint incorporated by reference all previous paragraphs. Looking back to the fact section of the complaint with this frame of reference, Mr. Thompson can see that the relevant allegations are those relating to the July 13, 2018 incident at the Trussville location of Cajun Steamer, when CS Ventures alleges that Mr. Thompson "stole alcohol from the bar and frank until 3 a.m." (Doc. 14 at 5).

Rule 10 notes that "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). CS

Ventures did separate each claim into numbered paragraphs, and each of the 14 claims was limited to a single set of circumstances—ignoring the unhelpful "Plaintiff incorporates all previous paragraphs as if fully stated herein" at the beginning of each count. Again, while the claims did not helpfully list the exact paragraphs where the facts in support were located, each claim included a brief statement of the facts in support that sufficiently gave Mr. Thompson notice of the claims alleged and the facts alleged in support of those claims. So the complaint did not violate Rule 10.

Mr. Thompson seeks to have the court enforce an instruction set forth by Judge Hopkins in *Creighton*. In *Creighton*, the plaintiff filed a shotgun pleading alleging fraud, which has a heightened pleading standard under Rule 9(b). 2016 WL 3519365, at *1–2. Judge Hopkins instructed the plaintiff to refile her complaint, noting that "the complaint must include the who, what, when, where, and how for **<u>each element</u>**, except scienter, of each claim for relief. The previous sentence should be taken **<u>literally</u>** . . . ." *Id.* at *3. But, apart from Count Four alleging fraudulent inducement and Count Twelve alleging fraud and/or suppression, the heightened pleading standard under Rule 9(b) does not apply to this complaint. So Judge Hopkins's instruction, which is tailored to the requirements of Rule 9(b), does not apply to this case.

Because CS Ventures' complaint did provide sufficient individual facts in each count to inform Mr. Thompson of which facts would be used in support of which count, and because the complaint stated its claims in numbered paragraphs limited to a single set of circumstances, this complaint is not a shotgun pleading. So, the court will DENY the motion to dismiss on the grounds that the complaint is a shotgun pleading.

### b. Failure to state a claim

Mr. Thompson argues that the court should dismiss Counts One, Two, Three, Four, Five, Six, Seven, Eight, Nine, and Thirteen for failure to state a claim. Each count will be discussed in turn.

### i.   Count One: Breach of the non-compete clause

Mr. Thompson contends that CS Ventures failed to state a claim of breach of the non-compete clause because the non-compete clause is unenforceable. Specifically, he argues that the non-complete clause violated Alabama law because he was not an employee at the time of signing the contract.

Under Alabama law, a contract that restrains a person from "exercising a lawful profession, trade, or business of any kind" is void unless it falls within an exception. Ala. Code § 8-1-190(a) (2015).[2] Generally, "[c]ontracts restraining employment are looked upon with disfavor, because they tend not only to deprive the public of efficient service, but tend to impoverish the individual." *Robinson v. Computer Servicenters*, 346 So. 2d 940, 943 (Ala. 1977).

But an exemption exists for such contracts between an agent, servant, or employee of a commercial entity and that entity:

> An agent, servant, or employee of a commercial entity may agree with such entity to refrain from carrying on or engaging in a similar business within a specified geographic area so long as the commercial entity carries on a like business therein, subject to reasonable restraints of time and place. Restraints of two years or less are presumed to be reasonable.

---

[2] The court notes that this section of the Alabama Code has been updated recently, effective January 1, 2016, from the previous section regarding restrictive covenants. But, for purposes of this case, the law has not changed much. "This section preserves the current presumption previously found in Section 8-1-1 of the Code of Alabama, 1975, against contracts in restraint of trade." Ala. Code § 8-1-190 cmt.

*Id.* § 8-1-190(b)(4). Notably, this exception "does not save a noncompete agreement unless the employee-employer relationship exists *at the time the agreement is executed.*" *Pitney Bowes, Inc. v. Berney Office Sols.*, 823 So. 2d 659, 662 (Ala. 2001).

Mr. Thompson contends that he was not an employee when he signed the RCA containing the non-compete clause. CS Ventures admits in the complaint that The Release was "to be effective as of February 1, 2016," and so CS Ventures terminated Mr. Thompson effective February 1, 2016, but the parties did not execute the Release and RCA until February 2, 2016. (Doc. 14 at 2). The effective date of the RCA was February 2, 2016. (Doc. 14-2 at 2, 4). Further, Mr. Thompson notes that the complaint contains no factual allegations that Mr. Thompson was an employee as of the date of the Release and the RCA, except for the general conclusion that "Defendant continued to be an employee of Plaintiff CS Ventures until the execution of the release." (Doc. 14 at 6).

CS Ventures argues that Mr. Thompson was an employee when he executed the RCA because the language of the Release demonstrates that Mr. Thompson was still an employee. For example, Mr. Thompson is referred to as "Employee" throughout the Release, and the purpose of the Release is to "set[] forth the respective rights and obligations of [the] parties in connection with the termination of the employment of Employee." (Doc. 14-1 at 2). Also, the documents were signed on February 2, 2019—after the effective termination date—but until the termination documents were signed, Mr. Thompson was still an employee.

Mr. Thompson points to two cases in which the Supreme Court of Alabama held that a non-compete agreement was unenforceable when the person was not an employee when he signed the agreement. In *Pitney Bowles*, the employer and individual executed the non-compete agreement, and then the employer hired the individual six months later without re-executing the

agreement once the individual was an employee. 823 So. 2d at 662. In *Livington v. Dobbs*, the employee was terminated five years before she and the employer executed the non-compete agreement—and the "employee" actually was a non-compensated waitress, which did not truly qualify as "employment." 559 So. 2d 569, 571–72 (Ala. 1990).

Neither of these cases is particularly illustrative of the situation at hand, in which Mr. Thompson signed the Release and RCA as part of his termination on February 2, 2016, although the effective date of the termination was February 1, 2016. And neither party can point to a case in which a non-compete agreement was upheld or found as void when the employer-employee relationship ended a day prior to the execution of the non-compete clause, which was included as part of the severance and termination documents.

Mr. Thompson also contends that CS Ventures must have had an intent to continue his employment when the non-compete agreement was signed. He relies on the Supreme Court of Alabama's holding that "it would be inequitable and unreasonable to enforce a contract which the employer did not intend to keep." *Robinson v. Computer Servicenters, Inc.*, 346 So. 2d 940, 943 (Ala. 1977). But in *Robinson*, the employee signed the non-compete agreement as part of his contract renewal, not as part of his termination. The court was concerned that the employee contracted away his rights without realizing that the company intended to fire him. That risk is not at issue in this case; Mr. Thompson signed the non-compete clause as part of his termination papers, so he fully understood he was contracting away his right to compete as part of his termination.

The court lacks sufficient facts regarding the exact order of the termination and execution of the Release and RCA. Throughout the Release, Mr. Thompson is referred to as the "Employee," but throughout the RCA, he is referred to as the "Principal." Both documents were

executed on February 2, 2016. And even though the documents backdate the effective date, Mr. Thompson must have still been employed on February 2, 2016, before the first agreement was signed, because the Release still refers to Mr. Thompson as the "Employee" and the Release is the document officially terminating Mr. Thompson's employment. So, the court is asked to determine which came first, the chicken or the egg. Did Mr. Thompson sign the Release first, officially terminating his employment with CS Ventures? Or did he sign the RCA first, when he was still an employee because he had not yet signed the Release?

This issue is a question of fact to be determined later. CS Ventures has alleged that Mr. Thompson was employed at the time he signed the Release and RCA. Under *Iqbal*, the complaint only must "state[] a plausible claim for relief [to] survive a motion to dismiss." 556 U.S. at 679. As such, the court finds it plausible that Mr. Thompson was employed by CS Ventures when the parties executed the RCA and Release.

In a footnote, Mr. Thompson alleges that the RCA's five-year restriction on competition violates § 8-1-190, which notes that all non-compete clauses with employees are "subject to reasonable restraints of time and place." The statute notes that "[r]estraints of two years or less are presumed to be reasonable." Ala. Code § 8-1-190(b)(4). And "[t]he party seeking enforcement of the covenant has the burden of proof on every element." *Id.* § 8-1-194. Cajun Steamer did not allege any reasons in its complaint why a five-year restriction was necessary and also did not respond to this argument in Mr. Thompson's motion to dismiss. So, because only a restraint up to two years is presumed reasonable, and because CS Ventures provided no allegations or facts why the five-year restraint was reasonable, the court cannot find the five-year restraint is reasonable in time.

But unreasonable duration does not entirely void the restraint. "If a contractually specified restraint is overly broad or unreasonable in its duration, a court may void the restraint in part and reform it to preserve the protectable interest or interests." Ala. Code. § 8-1-193. So, rather than voiding the restraint in its entirety, the court will modify the non-compete restrain to restrain Mr. Thompson from the specified activities for two years.

The court will DENY Mr. Thompson's motion to dismiss the non-compete clause for failure to state a claim because the length of the restraint was unreasonable. The court will MODIFY the non-compete clause by reducing the duration from five years to two years.

### ii. Count Two: Breach of the non-solicit clause

Mr. Thompson argues that the court must dismiss the breach of the non-solicit clause because the non-solicit clause violates Alabama law. Specifically, Mr. Thompson argues that (1) the provision prohibits Mr. Thomas from soliciting *any* employees, not just employees who hold a uniquely essential position; and (2) CS Ventures failed to allege any damages—an essential element to a breach of contract claim—as a result of the alleged breach.

Section 8-1-190 expressly limits the scope of non-solicit provisions. While generally non-solicit provisions are void, subsection (b)(1) provides a narrow exception:

> A contract between two or more persons or businesses or a person and a business limiting their ability to hire or employ the agent, servant, or employees of a party to the contract where the agent, servant, or employee holds a position uniquely essential to the management, organization, or service of the business.

Ala. Code § 8-1-190(b)(1). The comment explains that "'uniquely essential' . . . reflects the intent to limit use of the exception to circumstances in which the employee in question holds a position which is not only important to the business, but in which the agent, servant or employee's services would be very difficult to replicate." *Id.* cmt.

The non-solicit provision at issue in this case prohibits Mr. Thompson from "recruit[ing], solicit[ing], or induc[ing] any person or entity, who was an employee, agent, independent contractor or representative of the Company . . . to cease their employment, engagement or other relationship with the Company or solicit the services of such person . . . ." (Doc. 14-2 at 3). The plain language of the clause indicates that the provision is *not* limited to the solicitation of employees who hold a position uniquely essential to the management, organization, or service of the business. Instead, CS Ventures drafted the non-solicit clause to be as broad as possible, and now in its response asks the court to redraft the provision so that it complies with Alabama law. (Doc. 22 at 16).

CS Ventures cites to various Alabama cases in which the court struck portions of contractual provisions, "leaving the balance of the provision binding on the parties." *Cullman Broad. Co. v. Bosley*, 373 So. 2d 830, 835 (Ala. 1979) (noting that a restraint was not overbroad as applied when it prevented a radio announcer from announcing on a rival radio station); *see also Systrends, Inc. v. Grp. 8760, LLC*, 959 So. 2d 1052, 1080 (Ala. 2006) (limiting the geographic scope of the restrictive covenant); *Mason Corp. v. Kennedy*, 244 So. 2d 585 (1971) (holding that the court could enforce parts of the restrictive covenant when the territory or period was unreasonable).

But the Alabama Code provides that "[i]f a contractually specified restraint does not fall within the limited exceptions set out in subsection (b) of Section 8-1-190, a court may void the restraint in its entirety." Ala. Code § 8-1-193. Because this covenant was not unreasonable in duration, but unreasonable in *substance*, the statute does not instruct the court to merely void the unreasonably broad portion of the provision. *See id.* ("If a contractually specified restraint is overly broad or unreasonable in its duration, a court may void the restraint in part and reform

it . . . ."). A comment to the statute notes that "the intent of this section [is] to cause parties, especially the drafting party, to draft reasonable restraints, so the courts will not be burdened with parsing through unreasonable restraints." *Id.* cmt. So, the court will void the non-solicit provision.

Even if the court did not void the entire non-solicit provision, CS Ventures still failed to plead damages. "[T]o establish that a breach of contract has occurred, a plaintiff must prove: '(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" *Emps.' Benefit Ass'n v. Grissett*, 732 So. 2d 968, 975 (Ala. 1998) (quoting *S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995)). This case is only at the motion to dismiss stage, so CS Ventures only has to plausibly allege, not prove, each element. But CS Ventures has completely failed to allege any damages resulting from the alleged breach of the non-solicit clause. Instead, CS Ventures merely states "Plaintiff has been injured by Defendant's actions." (Doc. 14 at 8). The complaint concludes with CS Ventures seeking "damages of at least $3.8 million . . . to include compensatory and punitive damages, attorneys' fees and costs, and such other relief as this Court deems appropriate and necessary." (*Id.* at 16). The court cannot speculate what the damages are for the breach of the non-solicit clause as CS Ventures only seeks a *total* of $3.8 million total, without breaking down which counts or which harms this dollar amount covers. So, because CS Ventures has failed to allege each element of a breach of contract of the non-solicit provision, the court must DISMISS Count Two for failure to state a claim.

The court will GRANT Mr. Thompson's motion to dismiss Count Two for failure to state a claim on the grounds that the non-solicit clause violated Alabama law. The court will DISMISS Count Two.

### iii. Count Three: Inadequate consideration

In Count Three, CS Ventures seeks rescission of the Release—in the event the Court finds the RCA void—because the Release was not supported by adequate consideration. The Release, drafted by CS Ventures, contained several important provisions regarding CS Ventures and Mr. Thompson's relationship. CS Ventures paid Mr. Thompson $1,200,000.00 "in settlement of any and all claims of whatever kind which Employee has or might assert in connection with any aspect of his employment [or termination or request for a membership interest in CS Ventures]." (Doc. 14-1 at 2). In exchange, Mr. Thompson agreed to execute the RCA; not to enter the premises of any Cajun Steamer restaurant for one year; not to contact any employee or contractor of CS Ventures for one year; and not to perform any acts, including defamatory comments or threats of violence, which are detrimental to the name, business, or reputation of CS Ventures or other Releasees; to discharge CS Ventures and its affiliates, employees, officers, directors, agents, representatives, attorneys, and assigns from all claims, actions, liabilities, and the like. Further, the Release terminated Mr. Thompson's employment by CS Ventures.

Mr. Thompson argues that CS Ventures' claim for rescission of the Release based on inadequate consideration fails. Specifically, Mr. Thompson maintains (1) that the Release was based on adequate consideration, and (2) that this claim is not supported by the language of the Release or the RCA.

In this count, CS Ventures alleges that the Release was supported by inadequate consideration—$1,200,000.00 paid to Mr. Thompson—and Mr. Thompson's signing of the RCA, in turn, materially induced CS Ventures to execute the Release. Therefore, CS Ventures argues, if any material portion of the RCA is void, "a material and substantial portion of the

consideration for the Release" must also be rendered void. (Doc. 14 at 8). So, if the RCA is void, CS Ventures alleges that the consideration it received under the Release is shockingly inadequate compared to the $1,200,000.00 it paid to Mr. Thompson.

The Release states that CS Ventures paid Mr. Thompson $1,200,000.00 "[i]n settlement of any and all claims of whatever kind which [Mr. Thompson] has or might assert in connection with any aspect of his employment with company, the termination thereof or otherwise or his request for a membership interest in Company." (Doc. 14-1 at 2). The Release required Mr. Thompson to execute the RCA and to not enter "the premises of any of the Cajun Steamer restaurants owned by CS Ventures for any purpose nor to contact, whether by text, email, orally or in writing, any of the employees or contractors of CS Ventures for any reason." (*Id.*).

As discussed above in relation to Count Two, the court found void at least the non-solicit provision in the RCA. But the RCA also contains a severability clause, which states "[i]f any of the provisions of this Agreement are held to be unenforceable or invalid by any arbitration panel or court, the validity and enforceability of the remaining provisions will not be affected and shall continue in full force." So, even though the court has found one provision of the RCA void, the remaining covenants are still in force and thus count toward the consideration received by CS Ventures.

Inadequacy of consideration, alone, is generally not enough for rescission of a contract. *See Colburn v. Mid-State Homes, Inc.*, 266 So. 2d 865, 871 (Ala. 1972) ("The accepted general rule is that the mere inadequacy of consideration, alone, is insufficient to vitiate a contract or conveyance, otherwise valid."). And "the courts generally do not entertain questions of whether the consideration is *adequate*" because adequacy of consideration is "'for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced.'"

*ADTRAV Corp. v. Duluth Travel, Inc.*, No: 2:14-cv-56-TMP, 2016 WL 4614842, at *8 (N.D. Ala. Sept. 6, 2016) (quoting *Colburn*, 266 So. 2d at 871); *see also U.S. v. Coosa Valley Elec. Co-op., Inc.*, Civ. A. No. 85-C-0515-S, 1986 WL 11270, at *8 (N.D. Ala. Feb. 5, 1986) (upholding a contract in which a party challenged the *inadequacy* of consideration, not *failure* of consideration, because the inadequacy of consideration without something more is insufficient to vitiate a contract).

But inadequacy of consideration "so gross as to shock the conscience" may support rescission. *Cofer v. Moore*, 6 So. 306, 307 (Ala. 1889). CS Ventures contends that the consideration it received—Mr. Thompson's execution of the RCA—was grossly inadequate because the court may void part of the RCA. But the RCA still exists. While the court voided the non-solicit provision, the court upheld the non-compete provision. The parties even considered severability, including in the RCA that the voiding of one clause will not void the remainder of the agreement. Further, CS Ventures drafted both the RCA and the Release. It had the power to pick what consideration it wanted to enter into the Release—and it chose to have Mr. Thompson sign the RCA as consideration. The Supreme Court of Alabama noted that, in the case of grossly inadequate consideration, its concern is that the *drafting party* of the contract took advantage of the non-drafting party. *See Edwards v, Gordon*, 129 So. 43, 45 (Ala. 1930). The court cannot find that Mr. Thompson's execution of the RCA—which largely remains enforceable at this point—amounts to grossly inadequate consideration based on the facts alleged by CS Ventures.

So, because in Count Three CS Ventures argues for rescission of the contract *solely* based on inadequacy of consideration, and the consideration received was not grossly inadequate, the court will GRANT Mr. Thompson's motion to dismiss this count for failure to state a claim. The

court will DISMISS Count Three for rescission of the Release on the basis of inadequacy of consideration.

### iv. Count Four: Fraudulent inducement

Mr. Thompson argues that CS Ventures' claim for rescission of the Release based on fraudulent inducement fails. He contends that CS Ventures failed to meet the pleading standard for fraud set out by Federal Rule of Civil Procedure 9 because the complaint contains no allegation of any statement made by Mr. Thompson prior to the execution of the RCA and the Release on which CS Ventures could have relied.

Rule 9 states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Fraud in the inducement consists of one party's misrepresenting a material fact *concerning the subject matter of the underlying transaction* and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action." *Oakwood Mobile Homes, Inc. v. Barger*, 773 So. 2d 454, 459 (Ala. 2000).

CS Ventures alleges that Mr. Thompson "knew the RCA was unenforceable but agreed to execute the RCA anyway as part of the consideration for receiving $1,200,000.00 from Plaintiff pursuant to the Release," and that CS Ventures was induced into executing the Release based on Mr. Thompson's execution of the RCA. (Doc. 14 at 9). After the signing of the Release and RCA, CS Ventures alleges that Mr. Thomson "began a course of action in violation of the RCA, . . . including by taking steps to open a competing Cajun restaurant within 50 miles of the Hoover and Trussville Cajun Steamer locations, and by soliciting Plaintiff's employees to work at Defendant's new Cajun restaurant." (*Id.*).

CS Ventures maintains that these allegations are sufficient, particularly in light of "the well-recognized difficulty of uncovering fraud, especially prior to discovery." (Doc. 22 at 19). While the court notes the difficulty of uncovering fraud at this stage, Rule 9 exists to "alert defendants to the 'precise misconduct with which they are charged' and [to] protect[] defendants 'against spurious charges of immoral and fraudulent behavior.'" *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984), *cert. denied*, 469 U.S. 1211 (1985)).

The Eleventh Circuit explained that Rule 9(b) is satisfied if the complaint identifies four pieces of information:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (internal quotation omitted). Here, CS Ventures—at most—has alleged what Mr. Thompson obtained as a consequence of the fraud: $1,200,000.00. But CS Ventures has not alleged a single statement or omission, never mind the time and place for each statement, upon which it relied in executing the RCA and Release. A mere conclusory allegation that Mr. Thompson never intended to abide by the contract is insufficient to plead fraudulent inducement.

CS Ventures contends that its allegation that Mr. Thompson engaged in a course of conduct in violation of the RCA after it was executed demonstrates that he never intended to abide by the RCA. Even assuming this allegation is true, this allegation does not support CS Ventures' claim for fraudulent inducement because it fails to identify what Mr. Thompson said

or did *before* the signing of the RCA and Release that induced CS Ventures to execute the agreement.

So, because CS Ventures has failed to allege a single misrepresentation or omission upon which it relied in executing the Release and RCA, the court will GRANT Mr. Thompson's motion to dismiss Count Four for failure to state a claim. The court will DISMISS Count Four for rescission of the Release on the basis of fraudulent inducement.

### v. Count Five: Mutual mistake

Mr. Thompson argues that the court must dismiss CS Ventures' claim for rescission of the Release on the basis of mutual mistake because the complaint alleges no facts regarding a mutual mistake of any kind. In its response, CS Ventures agrees that this claim should be dismissed. (Doc. 22 at 20). So, the court will GRANT Mr. Thompson's motion to dismiss Count Five. The court will DISMISS Count Five for rescission of the Release on the basis of mutual mistake.

### vi. Count Six: Breach of the confidentiality agreement

Mr. Thompson argues that the court must dismiss the breach of the confidentiality agreement claim because CS Ventures has failed to plead a single fact regarding how Mr. Thompson allegedly breached the confidentiality agreement and because CS Ventures failed to plead damages as a result of the breach.

In the complaint, CS Ventures generally alleges that "Defendant has violated the Confidentiality Agreement provisions of the RCA by appropriating 'Confidential Information' of Plaintiff, include 'data and information which relates to [Plaintiff's] Business which was disclosed to [Defendant] or [Defendant] became aware of as a consequence of his employment

with [Plaintiff]." (Doc. 14 at 11). Nowhere in the complaint does CS Ventures allege any more facts regarding the alleged breach of the confidentiality agreement.

CS Ventures argues that, while it did not allege specifically what confidential information Mr. Thompson appropriated, it did allege that Mr. Thompson is opening a Cajun restaurant. In its response, CS Ventures maintains that "it is patently obvious that Defendant will use Confidential Information such as ingredients, recipes, food suppliers, methods of preparing food, and other information gained through 12 years of integral involvement in the Cajun Steamer business in establishing his own Cajun restaurant." (Doc. 22 at 21). CS Ventures also asks the court to allow it to discover what confidential information Mr. Thompson allegedly possessed and appropriated.

As the case is alleged, CS Ventures has no idea whether Mr. Thompson will use confidential information. Instead, CS Ventures *assumes* Mr. Thompson will *in the future* use unidentified confidential information because he also is opening a Cajun restaurant.[3] CS Ventures cannot even narrow down the category of confidential information Mr. Thompson supposedly will use. Instead, it seeks to embark on a fishing expedition to find confidential information in Mr. Thompson's possession. And "the discovery rules do not permit the [parties] to go on a fishing expedition." *Porter v. Ray*, 461 F.3d 1315, 1324 (11th Cir. 2006).

Additionally, CS Ventures has not alleged any damages resulting from the breach of the confidentiality agreement, possibly because the breach has not yet occurred per CS Ventures' use of the future tense in its response. CS Ventures only generally alleges "Plaintiff has been injured by Defendant's actions" and seeks $3.8 million as damages from the complaint as a whole. (Doc.

---

[3] CS Ventures cannot even allege that Mr. Thompson *used* confidential information. Instead, CS Ventures states in its reply that he *will* use the information, which—although not raised in Mr. Thompson's motion to dismiss—suggests a potential standing issue of whether this claim is premature.

14 at 11). And, as discussed above regarding the alleged breach of the non-solicit provision, a plaintiff must allege damages to assert a claim for breach of contract. *See Emps.' Benefit Ass'n*, 732 So. 2d at 975 ("[T]o establish that a breach of contract has occurred, a plaintiff must prove: '(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" (quoting *S. Med. Health Sys., Inc.*, 669 So. 2d at 99)).

So, because CS Ventures failed to allege any facts regarding the breach of the confidentiality agreement and failed to plead damages, the court will GRANT Mr. Thompson's motion to dismiss Count Six for failure to state a claim. The court will DISMISS Count Six for breach of the confidentiality agreement.

### vii.   Count Seven: Breach of the Release

Mr. Thompson argues that CS Ventures' claim for breach of the Release fails because (1) CS Ventures only alleges that Mr. Thompson breached the agreement by defaming Mr. Buie, a nonparty to this case; and (2) CS Ventures failed to allege any damages as a result of the breach.

The Release provides that Mr. Thompson "will not willfully perform any acts (such as defamatory comments or threats of violence or vengeful acts) which are detrimental to the name, business, or reputation of Company or Releasees, as hereafter defined." (Doc. 14-1 at 3). The Release defines the Releasees as "X4, LLC, James T. Powers, and Chandler Buie." (*Id.*). CS Ventures alleges that Mr. Thompson violated the Release by "making derogatory comments about [Mr.] Buie, including that [Mr.] Buie did not understand the business, he was not qualified to run the business, and questioning [Mr.] Buie's commitment to Cajun Steamer." (Doc. 14 at 11).

Mr. Thompson contends that he did not violate the Release because CS Ventures alleged no defamatory comments or threats of physical violence by Mr. Thompson against "Cajun Steamer Ventures, LLC, which is the only Plaintiff in this lawsuit." (Doc. 19 at 23). Mr. Thompson is correct—CS Ventures does not allege that Mr. Thomson made defamatory comments or physical threats against it. But the Release prohibits Mr. Thompson from making such remarks against the Releasees, which include Mr. Buie.

Mr. Thompson seems to conflate requirements for asserting defamation with the requirements for asserting breach of the Release. While similar in that the Release prohibits Mr. Thompson from making derogatory remarks, Count Seven alleges breach of contract, *not* the tort of defamation. So, by alleging that Mr. Thompson made such remarks against Mr. Buie, CS Ventures has alleged that Mr. Thompson acted in violation of the Release, i.e., that Mr. Thompson breached the contract.

But CS Ventures has not alleged any damages resulting from the breach of the Release. CS Ventures only generally alleges "Plaintiff has been injured" and seeks $3.8 million as damages from the complaint as a whole. (Doc. 14 at 14). And, as discussed above regarding the alleged breach of the non-solicit provision and the alleged breach of the confidentiality agreement, a plaintiff must allege damages to assert a claim for breach of contract. *See Emps.' Benefit Ass'n*, 732 So. 2d at 975 ("[T]o establish that a breach of contract has occurred, a plaintiff must prove: '(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" (quoting *S. Med. Health Sys., Inc.*, 669 So. 2d at 99)).

So, because CS Ventures failed to plead damages, the court will GRANT Mr. Thompson's motion to dismiss Count Seven for failure to state a claim. The court will DISMISS Count Seven for breach of the Release.

### viii.  Count Eight: Defamation

Mr. Thompson argues that CS Ventures' claim for defamation fails because (1) CS Ventures cannot recover in defamation when the allegedly defamatory statement was not made against it; (2) the allegedly defamatory statement was one of opinion, not fact; and (3) CS Ventures failed to allege any special damages pursuant to Rule 9(g).

CS Ventures alleges that Mr. Thompson "made a false and defamatory statements [sic] to the manager of Cajun Steamer's Trussville restaurant in early 2018 that [Mr.] Buie was not fit to run the Cajun Steamer, that [Mr.] Buie was not acting in Cajun Steamer's best interest, and that [Mr.] Buie was not qualified to run the Cajun Steamer." (Doc. 14 at 12). Mr. Buie, as explained in the complaint, owns all outstanding membership interests in X4, the parent company of CS Ventures. (*Id.* at 3).

A plaintiff must establish four elements to plead defamation:

> 1) a false *and* defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.

*Wal-Mart Stores, Inc. v. Smitherman*, 872 So. 2d 833, 840 (Ala. 2003). Generally, "[t]he tort action of defamation is personal to the party defamed. The general rule precludes a person from recovering for a defamatory statement made about another, even if the statement indirectly inflicts some injury upon the party seeking recovery." *Larrimore v. Dubose*, 827 So. 2d 60, 62 (Ala. 2001) (quoting *McBeth v. United Press Int'l, Inc.*, 505 F.2d 959, 960 (5th Cir. 1974)

(internal citations omitted)). In *Larrimore*, the court held that a wife was not defamed by statements accusing her husband of adultery because the statement did not defame *her*. *Id.*

CS Ventures cites two non-binding cases to support its proposition that a "corporation can be defamed if the statement 'assail[s] its financial position, its business methods, or accuse[s] it of fraud or mismanagement.'" *Summit DNA, L.L.C. v. Proove Biosciences, Inc.*, No: WDQ-14-1329, 2015 WL 3901973, at *5 (N.D. Md. June 23, 2015) (quoting *Novick v. Heart Corp.*, 278 F. Supp. 277, 280 (D. Md. 1968)); *see Gen. Prods. Co. v. Meredith Corp.*, 526 F. Supp. 546, 549–50 (E.D. Va. 1981) ("A corporation may be defamed by statements which cast aspersion on its honesty, credit, efficiency, or its prestige or standing in its field of business."). But Mr. Thompson does not dispute that a corporation can be defamed, but whether his statement pertained to the corporation.

In *Summit DNA*, the defamatory statement said that "Summit has been marketing AI Biotech and Genomind genetic testing—which is an overt breach of our Conflict of Interest provision in Summit's contract with Proove." 2015 WL 39019673, at *4. The court found this statement pertained to the corporation because it accused the corporation of "purposefully breaking a conflict of interest provision, which casts aspersion on its business practices and honesty." *Id.* at *5. In *General Products*, the defamatory article said that consumers should not buy triple-wall chimneys—which the plaintiff manufactured—except for prefabricated fireplaces due to fire hazards. 526 F. Supp. at 548–49. The court concluded that these statements defamed the plaintiff because the article did not distinguish between two types of tripe-wall chimneys, one of which was safe, and readers of the article could not distinguish the plaintiff's chimneys, which were safe, from the larger group of triple-wall chimneys. *Id.* at 549–50.

Mr. Thompson's statements seem more similar to those in *Larrimore* than to those in *Summit DNA* or *General Products*. Mr. Thompson's statements accused *Mr. Buie* of being unqualified to run CS Ventures, but does not make any statement against CS Ventures.

However, a comment to the Restatement (Second) of Torts notes that "[a] corporation is not defamed by communications defamatory of its officers, agents or stockholders unless they also reflect discredit upon the method by which the corporation conducts its business." Restatement (Second) of Torts, § 561 (1977) (internal citations omitted). Mr. Buie, as a majority stockholder of X4, which owns CS Ventures, is a stockholder in CS Ventures. Mr. Thompson's remarks criticize Mr. Buie's management of CS Ventures, which discredits the method by which CS Ventures conducts its business. So, the court finds that Mr. Thompson's statements could plausibly pertain to CS Ventures.

Mr. Thompson also claims that the statements were opinion, not fact. *See Oliver v. YMCA of Greater Birmingham*, No. 2:17-cv-356-VEH, 2017 WL 5714291, at *8 (N.D. Ala. Nov. 28, 2017) ("[E]ven if the YMCA could somehow be held responsible for this comment, it is a statement of opinion, not specifically directed at the Plaintiff, and, on its face is not defamatory."). "A communication is considered defamatory 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Harris v. Sch. Annual Pub. Co.*, 466 So. 2d 963, 964 (Ala. 1985) (quoting Restatement (Second) of Torts § 559 (1976)). But whether a statement is opinion or fact "should typically be resolved by a jury unless no reasonable jury could find it to be a statement of fact." *Thomas v. Henderson*, 297 F. Supp. 2d 1311, 1316 (S.D. Ala. 2003). Here, the statements alleged could have been stated as facts or as opinions. But because the court finds

that a reasonable jury could find the statements as either facts or opinions, the court cannot conclusively find that the statements were opinions at this motion to dismiss stage.

The final element of defamation is to establish damages. "Damage is implied by law when spoken words are found to be slander per se." *Delta Health Grp., Inc. v. Stafford*, 887 So. 2d 887, 896 (Ala. 2004). And "[t]o constitute slander actionable per se, there must be an imputation of an indictable offense involving infamy or moral turpitude." *Ceravolo v. Brown*, 364 So. 2d 1155, 1157 (Ala. 1978) (quoting *Marion v. Davis*, 114 So. 357, 359 (Ala. 1927)). Mr. Thompson insinuated that Mr. Buie was bad at his job, but in no way imputed a crime of infamy or moral turpitude. So, because Mr. Thompson's statements did not impute an indictable offense involving infamy or moral turpitude, CS Ventures must allege special damages.

Mr. Thompson contends that CS Ventures failed to allege special damages pursuant to Rule 9(g). Rule 9(g) states that "[i]f an item of special damage is claimed, it must be specifically stated." Fed. R. Civ. P. 9(g). The complaint merely alleges that "Plaintiff was harmed by Defendant's defamatory remarks," without providing any specific facts. (Doc. 14 at 12). The court cannot determine any damages CS Ventures alleges, so CS Ventures failed to specifically state special damages as the final element of establishing a defamation claim.

So, the court will GRANT Mr. Thompson's motion to dismiss Count Eight for failure to state a claim. The court will DISMISS Count Eight alleging defamation.

### ix.   Count Nine: Intentional interference with contract[4]

Mr. Thompson argues that CS Ventures fails to state a claim for intentional interference with contract because CS Ventures fails to reference a specific employee or customer who had a relationship or contract with CS Ventures with whom Mr. Thompson supposedly interfered.

CS Ventures alleges that it has a contractual relationship with its employees, specifically the General Manager and Kitchen Manager at the Trussville location, and it has a protected business relationship with its customers through "the good will and brand loyalty of customers to Plaintiff's Cajun Steamer restaurants." (Doc. 14 at 13). CS Ventures claims that Mr. Thompson was aware of these relationships, although he was not a party to the relationships.

To allege wrongful interference with a business relationship under Alabama law, the plaintiff must establish five elements: "(1) the existence of a protected business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *Edwards v. Prime, Inc.* 602 F.3d 1276, 1302 (11th Cir. 2010). Mr. Thompson argues that CS Ventures fails to meet the first element—the protected business relationship—with employees or customers. But CS Ventures has a protected business relationship with its employees via employment contracts. A contractual relationship is not required to establish a protected business interest; instead Alabama law dictates that "protection is appropriate against improper interference with reasonable expectancies of commercial relations." *Ex parte Ala. Dep't of Transp.*, 764 So. 2d 1263, 1270 (Ala. 2000) (quoting Restatement (Second) of Torts, § 766 cmt. c (1979)). But here, the employees do have a contractual relationship with CS Ventures, their employer. While not necessary, the employment

---

[4] The court notes that while CS Ventures repeatedly refers to Count Nine as "intentional interference with contract," the proper name for this tort is "tortious interference with a business relationship."

contract is sufficient to establish a protected business relationship. *See White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 12 (Ala. 2009) (noting that the law provides greater protection when a contractual relationship exists). So, at least as to the Kitchen Manager and General Manager, CS Ventures has a protected business relationship.

The customers in this case are nameless individuals who have visited Cajun Steamers and *potentially* would in the future revisit the restaurants. One court notes that no Alabama case law exists that "expanded the tort to include future relationships with nameless customers of an unformed, but anticipated, business." *Hope for Families & Cmty. Serv., Inc. v. Warren*, 721 F. Supp. 2d 1079, 1187 (M.D. Ala. 2010). And CS Ventures has not alleged that these customers are regulars who visit Cajun Steamer week after week. Instead, CS Ventures merely claims that a business relationship exists with the customers based on the customers' "good will and brand loyalty." (Doc. 14 at 13). But such a general allegation is insufficient to allege a protected business interest. The complaint contains no allegations that these customers have a habit of attending Cajun Steamer restaurants or that they will ever return to a Cajun Steamer restaurant. Further, CS Ventures does not even attempt to narrow down with *which* customers it has a relationship. To suggest that a restaurant has a protected business interest with every customer who ever walks in the door would suggest that the restaurant could have a cause of action against any new restaurant that solicited its customers. So, while CS Ventures has a protected business interest with its employees, it does not have a protected business interest with its customers.

Mr. Thompson also claims that CS Ventures failed to allege that he interfered with the Kitchen Manager and General Manager other than by attempting to hire him or them. But Mr. Thompson asserts no law why his attempt to hire the Kitchen Manager and General Manager would not qualify as interference. An attempt to solicit employees from a competitor would

necessarily interfere with the existing business relationship. So, the court finds that CS Ventures plausibly alleged that Mr. Thompson interfered with CS Ventures' relationship with the Kitchen Manager and General Manager by attempting to hire him or them.

To the extent CS Ventures notes in its response that it alleged intentional interference regarding the prospective purchasers of Cajun Steamer, (doc. 22 at 25), CS Ventures failed to allege such interference in Count Nine. Count Nine only alleges interference with employees and customers.

So, because CS Ventures failed to establish a protected business relationship with its customers, the court will GRANT Mr. Thompson's motion to dismiss Count Nine for failure to state a claim as to its customers. The court will DISMISS Count Nine for intentional interference with contract as to the customers. But the court will DENY Mr. Thompson's motion to dismiss Count Nine for failure to state a claim as to the Kitchen Manager and General Manager.

### x. Count Thirteen: Unjust enrichment

Mr. Thompson argues that the court should dismiss CS Ventures' claim for unjust enrichment because unjust enrichment is an equitable remedy only appropriate when no adequate remedy at law exists. Because CS Ventures has pled the existence of two express contracts, Mr. Thompson contends that it cannot also plead unjust enrichment.

While Mr. Thompson is correct that CS Ventures cannot *recover* for breach of contract and unjust enrichment, Mr. Thompson fails to acknowledge CS Ventures' ability to plead alternative claims for recovery. Rule 8 states that "a party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Because this case is only at the motion to dismiss stage, CS Ventures may plead both breach of contract and unjust enrichment, even though ultimately it will only be able to recover under one category of relief.

Indeed, the alternative pleading rule is also why CS Ventures simultaneously can seek enforcement of the agreements in this case and rescission of the agreements.

So, because CS Ventures may plead both breach of contract and unjust enrichment at this stage, the court will DENY Mr. Thompson's motion to dismiss Count Thirteen for failure to state a claim.

## IV. Conclusion

For the reasons discussed above, the court will GRANT IN PART and DENY IN PART Mr. Thompson's motion to dismiss. (Doc. 19). The court will GRANT Mr. Thompson's motion to dismiss for failure to state a claim as to Counts Two, Three, Four, Five, Six, Seven, and Eight; and will GRANT as to customers in Count Nine. The court will DENY Mr. Thompson's motion to dismiss for shotgun pleading as to all counts and for failure to state a claim as to Counts One and Thirteen, and as to the General Manager and Kitchen Manager in Count Nine.

The court will DISMISS WITHOUT PREJUDICE Counts Two, Three, Four, Five, Six, Seven, Eight, and Nine as to the customers. Only Counts One, Ten, Eleven, Twelve, Thirteen, Fourteen, and Nine as to the General Manager and Kitchen Manager remain. The court will MODIFY the non-compete clause in Count One from a five-year limitation to a two-year limitation. The court will enter a separate Order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this 12th day of July, 2019.

_Karon O. Bowdre_
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE